UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

Case No. _____

CLENNON DEWAYNE MELTON,

    Plaintiff,

v.

I-10 TRUCK CENTER, INC.,
a Florida corporation, and
BRIAN BRIGMAN and JASON
BRIGMAN, individually,

                                                  **Jury Trial Demanded**

    Defendants.
_____/

## COMPLAINT

The plaintiff, Clennon Dewayne Melton, by his undersigned attorney, makes the following Complaint against the defendants, I-10 Truck Center, Inc., Brian Brigman, and Jason Brigman:

1. This is an action to redress race discrimination, racial harassment, and retaliation by the defendants against the plaintiff with regard to his contractual employment relationship with defendant I-10 Truck Center, Inc. The plaintiff brings this action pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("Section 1981"). The plaintiff seeks injunctive and equitable relief, compensatory and punitive damages, and an award of costs, expenses, and attorneys' fees.

## Parties

2. The plaintiff, Clennon Dewayne Melton ("Melton"), is and at all times relevant to this action was an adult African American resident of Okaloosa County in the State of Florida.

3. The defendant, I-10 Truck Center, Inc. ("I-10"), is a for-profit corporation organized and doing business pursuant to the laws of the state of Florida with a principal place of business in Walton County, Florida.

4. The defendant, Brian Brigman, is an adult resident of the State of Florida. At all times relevant to this Complaint, Brian Brigman was the president of I-10 and the officer who had primary and final responsibility for all corporate decisions.

5. The defendant, Jason Brigman, is an adult resident of the State of Florida and the son of defendant Brian Brigman. At all times relevant to this Complaint, Jason Brigman was an employee of I-10 and had managerial authority over Melton.

## Jurisdiction and Venue

6. This court has original jurisdiction of plaintiff's Section 1981 claim pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

7. The plaintiff and the defendants reside, and the events that give rise to the plaintiff's claim occurred, in the Northern District of Florida. Venue in this court is appropriate pursuant to 28 U.S.C. § 1391(b).

## General Allegations

8. Beginning in or about February 2020 and ending on or about August 5, 2021, Melton was employed by I-10 as a salesperson.

9. Prior to his employment by I-10, Melton had substantial sales experience in comparable employment and was highly qualified for his position.

10. During the term of Melton's employment, I-10 employed white salespersons who held substantially similar salesperson positions with the same responsibilities and duties as Melton.

11. During the term of Melton's employment, I-10 employed no other African Americans as salespersons.

12. At all times during his employment, Melton performed his job duties as capably as white salespersons who were employed by I-10.

13. During the term of Melton's employment, I-10 treated white salespersons more favorably than it treated Melton with regard to the terms, conditions, privileges, and benefits of employment, including but not limited to the following:

    a. I-10 allowed white salespersons, but not Melton, to have a key and alarm code to the offices, including at least one white salesperson with less seniority than Melton.

    b. I-10 required Melton to clock in and out at the start and end of his workday. I-10 did not impose that same requirement on white salespersons.

    c. I-10 required Melton to work from "bell to bell" (opening to closing) but did not impose the same requirement on white salespersons.

    d. I-10 deducted money from Melton's pay for missing time from work. I-10 did not deduct money from the pay of white salespersons when they missed substantially similar time from work for substantially similar reasons. For example, Melton was admonished and subjected to pay deductions for taking time off for

doctor's appointments. White salespersons were allowed to take time off for doctor's appointments or personal errands without being admonished or subject to pay deductions.

    e.    I-10 initially compensated Melton with a fixed salary plus commission, as it did with white salespersons. I-10 then reduced Melton's compensation by changing his fixed salary to an hourly wage while continuing to compensate white salespersons with a fixed salary.

    f.    I-10 required Melton to split his commission with a white salesperson who helped him make a sale. When Melton helped a white salesperson make a sale, Melton was not given a share of the commission.

    g.    I-10 reprimanded Melton for taking a truck off of the on-line sales inventory after a customer agreed to (and did) buy the truck. White employees have taken trucks off-line before sales were consummated under the same circumstances but were not disciplined for their actions.

    h.    I-10 maintains a formal policy to distribute sales calls equally to all salespersons on weekends. In practice, I-10 gave weekend sales calls to a white salesperson and not to Melton, causing Melton to lose the opportunity to earn commissions.

    i.    I-10 terminated Melton's employment with the excuse that Melton missed work to attend a doctor's appointment. White employees missed work for a variety of reasons, including doctor's appointments, but were not terminated.

14.    During the term of Melton's employment, Melton was subject to repeated and frequent instances of unwelcome conduct that created a hostile, uncomfortable, oppressive,

and threatening work environment because of Melton's race, including but not limited to the following:

      a.      During a discussion about a truck sale with a white salesperson named Joe Andrews ("Andrews"), Andrews threatened Melton and called him the racially derogatory term "boy." Melton complained to I-10 about the use of a derogatory racial term but was never provided with evidence that any corrective action was taken against Andrews.

      b.      Melton was subject to daily micro-management by Andrews, who had substantially less sales experience than Melton and was not Melton's supervisor. The micro-management consisted of unfounded and nit-picky complaints that were not directed toward white salespersons who engaged in identical or substantially similar conduct. Melton complained to Jason Brigman about Andrews' harassment but Jason Brigman was a close friend of Andrews and I-10 took no corrective action against Andrews.

      c.      Melton was made to endure a daily barrage of disparaging remarks in the workplace about nonwhite people, including demeaning references to Mexicans and references to dark-skinned South Asians as "dot heads."

      d.      Jason Brigman repeatedly and frequently complained about nonwhite customers but did not make comparable complaints about white customers. For example, Brigman repeatedly told Melton that nonwhite customers "pretended they couldn't speak English until it was time to talk about money." Melton also heard Jason Brigman refer to a customer as a "stupid nigger."

      e.     In Melton's presence, Joe Andrews and Brian Brigman repeatedly wondered where nonwhite customers got their money, implying or expressly surmising that the money came from illicit sources, but did not raise the same questions about the source of white customers' money.

      f.     Andrews, Brian Brigman, and Jason Brigman often ignored nonwhite customers, leaving Melton to serve them.

      g.     I-10 treated white employees more favorably than it treated Melton as alleged previously in this Complaint.

15.    Melton repeatedly complained to management about race discrimination and racial harassment at I-10. I-10 responded that he could leave if he did not like the way the company operated.

16.    No corrective action was taken to eliminate race discrimination or racial harassment in response to Melton's complaints.

17.    Melton complained to management about Andrews' racially harassing reference to him as "boy." I-10 responded to the complaint by writing up Melton as a disciplinary measure, allegedly for being "disrespectful" to the employee who called him "boy." The disciplinary action was taken in retaliation for Melton's complaint about racial harassment.

18.    The reduction of Melton's compensation by changing his pay from a fixed salary to an hourly wage came within days after Melton complained to I-10 about racial harassment.

19.    The termination of Melton's employment came within days after Melton complained to I-10 about racial harassment.

20. Prior to the termination of his employment, Melton overheard Jason Brigman tell another employee that I-10 was going to get rid of Melton but needed to do it "the right way."

## First Claim: Employment Discrimination

21. Melton realleges and incorporates by reference the allegations stated in paragraphs 1 to 20 above.

22. Melton is an African American.

23. Melton was employed by defendant I-10.

24. Melton was subject to the supervisory authority of Brian Brigman during the course of his employment.

25. Melton was subject to the supervisory authority of Jason Brigman during the course of his employment.

26. Melton had a contractual relationship with defendant I-10 by virtue of the defendant's agreement to employ Melton and to compensate Melton in exchange for work performed.

27. The defendants intentionally deprived Melton of the same employment opportunities that it made available to white citizens because of Melton's race in violation of 42 U.S.C. § 1981.

28. The defendants intentionally deprived Melton of the same benefits, privileges, terms, and conditions of employment as are enjoyed by the defendants' white employees because of Melton's race in violation of 42 U.S.C. § 1981.

29. The defendants intentionally took adverse employment actions against Melton as described in this Complaint, including but not limited to reducing and docking

his pay, depriving him of opportunities to earn commissions, requiring him to share commissions, and terminating his employment.

30. Melton's race was a substantial factor that motivated each of the discriminatory actions described in this Complaint or, in the alternative, Melton's race was a "but for" cause of each discriminatory action described in this Complaint.

31. Brian Brigman was aware of and authorized, directed, or ratified the adverse employment actions described in this Complaint.

32. Jason Brigman was aware of and recommended or intentionally influenced the adverse employment actions described in this Complaint.

33. As a direct, substantial, and proximate result of the racially discriminatory actions described above, Melton suffered and will continue to suffer lost wages and benefits and has suffered and will continue to suffer emotional distress, mental anguish, humiliation, anxiety, loss of dignity, and loss of enjoyment of life.

34. The defendants' racially discriminatory conduct, individually and collectively, was willful, wanton, and outrageous and was taken with malice and reckless indifference to Melton's rights.

**Second Claim: Racial Harassment and Hostile Work Environment**

35. Melton realleges and incorporates by reference the allegations stated in paragraphs 1 to 20 above.

36. Melton is an African American.

37. Melton was employed by defendant I-10.

38. Melton was subject to the supervisory authority of Brian Brigman during the course of his employment.

39. Melton was subject to the supervisory authority of Jason Brigman during the course of his employment.

40. Melton had a contractual relationship with defendant I-10 by virtue of the defendant's agreement to employ Melton and to compensate Melton in exchange for work performed.

41. Melton was subject to unwelcome conduct in the workplace because of his race or, in the alternative, Melton's race was a substantial factor that motivated the unwelcome conduct.

42. The unwelcome conduct to which Melton was subjected created a work environment that was hostile, abusive, oppressive, offensive, insulting, and threatening.

43. The unwelcome conduct to which Melton was subjected was so severe and pervasive that it altered the terms and conditions of his employment to his disadvantage.

44. I-10 knew of the unwelcome conduct to which Melton was subjected and made no reasonable effort to protect Melton from it, thus allowing the hostile work environment to continue.

45. Brian Brigman was aware of and participated in unwelcome conduct toward Melton that created a hostile work environment.

46. Jason Brigman was aware of and participated in unwelcome conduct toward Melton that created a hostile work environment.

47. As a direct, substantial, and proximate result of the racial harassment described above, Melton suffered and will continue to suffer lost wages and benefits and has suffered and will continue to suffer emotional distress, mental anguish, humiliation, anxiety, loss of dignity, and loss of enjoyment of life.

48. The defendants' racially harassing conduct, individually and collectively, was willful, wanton, and outrageous and was taken with malice and reckless indifference to Melton's rights.

### Third Claim: Retaliation

49. Melton realleges and incorporates by reference the allegations stated in paragraphs 1 to 20 above.

50. Melton is an African American.

51. Melton was employed by defendant I-10.

52. Melton was subject to the supervisory authority of Brian Brigman during the course of his employment.

53. Melton was subject to the supervisory authority of Jason Brigman during the course of his employment.

54. Melton had a contractual relationship with defendant I-10 by virtue of the defendant's agreement to employ Melton and to compensate Melton in exchange for work performed.

55. Melton repeatedly complained to I-10 that he had been subjected to discrimination in the terms and conditions of his employment because of his race.

56. Melton repeatedly complained to I-10 that he had been subjected to a hostile, abusive, and threatening work environment because of his race.

57. Melton acted reasonably and in good faith when he complained to I-10 about race discrimination and racial harassment.

58. I-10 took materially adverse actions against Melton because of his complaints about race discrimination and racial harassment, including but not limited to unwelcome acts of harassment as described in this Complaint and the termination of his employment.

59. Brian Brigman participated in and authorized, directed, or ratified adverse actions against Melton because of Melton's race.

60. Jason Brigman participated in and recommended or intentionally influenced adverse actions against Melton because of Melton's race.

61. As a direct, substantial, and proximate result of the retaliation described above, Melton suffered and will continue to suffer lost wages and benefits and has suffered and will continue to suffer emotional distress, mental anguish, humiliation, anxiety, loss of dignity, and loss of enjoyment of life.

62. The defendants' retaliatory conduct, individually and collectively, was willful, wanton, and outrageous and was taken with malice and reckless indifference to Melton's rights.

WHEREFORE, plaintiff Clennon Dewayne Melton requests the entry of judgment against defendants, I-10 Truck Center, Inc., Brian Brigman, and Jason Brigman, jointly and severally, as follows:

a. For an award of past and future lost wages and benefits in an amount to be determined at trial;

b. For an award of compensatory damages in an amount to be determined at trial;

c. For an award of punitive damages in an amount to be determined at trial;

  d.  For an equitable order requiring defendant to restore plaintiff to the employment position that he occupied before his termination or, in the alternative, for an equitable award of front pay;

  e.  For an injunction prohibiting further acts of discrimination, harassment, and retaliation against the plaintiff;

  f.  For an award of actual costs and a reasonable attorney's fee as authorized by 29 U.S.C. § 1988; and

  g.  For such other and further relief as is just and necessary.

## Jury Demand

Plaintiff requests a trial by jury.

Dated:  November 22, 2021
Plantation, Florida

            Respectfully submitted,

            */s/ Robert S. Norell*
            Robert S. Norell, Esq. (Fla. Bar No. 996777)
            E-Mail: rob@floridawagelaw.com
            **ROBERT S. NORELL, P.A.**
            300 N.W. 70th Avenue
            Suite 305
            Plantation, Florida 33317
            Tel.: (954) 617-6017
            Fax: (954) 617-6018
            *Counsel for Plaintiff*